IN CLERK'S OFFICE U.S.
DISTRICT COURT
E.D.N.Y.
*OCTOBER 24, 2024 *
BROOKLYN OFFICE

HDM:SME/MRG/SJ/AT
F. #2022R00935

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N D I C T M E N T |
| - against - | Cr. No. 24-CR-433 |
| | (T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, |
| GAUTAM S. ADANI, | U.S.C., §§ 371, 981(a)(1)(C), 982(a)(2)(A), |
| SAGAR R. ADANI, | 982(b)(1), 1349, 1512(k), 2, 3238 and 3551 et |
| VNEET S. JAAIN, | seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., |
| RANJIT GUPTA, | § 2461(c)) |
| CYRIL CABANES, | **Judge Nicholas G. Garaufis** |
| SAURABH AGARWAL, | **Magistrate Judge James R. Cho** |
| DEEPAK MALHOTRA and | |
| RUPESH AGARWAL, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise stated:

I.    Background

A.    Overview

1.    In or about and between 2020 and 2024, senior executives of (i) an Indian renewable-energy company, which was a portfolio company of an Indian conglomerate; (ii) an issuer company that operated in the renewable-energy sector whose securities were traded on a United States exchange; and (iii) that issuer's largest shareholder, a Canadian institutional investor, participated in a scheme to bribe Indian government officials to ensure the execution of lucrative solar energy supply contracts with Indian government entities. During the same period, senior executives of the Indian renewable-energy company (i) conspired to misrepresent the

company's anti-bribery practices to United States-based investors and international financial

institutions and (ii) concealed from those same investors and institutions their bribery of Indian

government officials to obtain billions of dollars in financing for green energy projects, including

the corrupt solar energy supply contracts. In addition, senior executives of the issuer company

and its Canadian institutional investor conspired to obstruct the United States government's

investigations into the bribery scheme.

B.    Entities Associated with the Defendants

2.    The "Conglomerate"[1] was a diversified, multinational organization, which

had its corporate offices in India. The Conglomerate was one of India's largest business

organizations and was comprised of portfolio companies, including the "Indian Energy

Company."

3.    The "Indian Energy Company" was a renewable-energy company

operating and headquartered in India. The Indian Energy Company was a portfolio company of

the Conglomerate, and its securities were publicly traded in India.

4.    The "U.S. Issuer" was a renewable-energy company incorporated in

Mauritius. The U.S. Issuer had securities that were registered pursuant to Section 12 of the

Securities Exchange Act of 1934 (Title 15, United States Code, Section 78l) and traded on the

New York Stock Exchange until approximately November 2023. The U.S. Issuer was required

to file periodic reports with the United States Securities and Exchange Commission ("SEC")

---

[1]    The identity of the Conglomerate and all other anonymized entities and individuals
discussed herein are known to the Grand Jury.

until approximately April 2024. The U.S. Issuer was an "issuer," as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1(a).

5. The "U.S. Issuer's Subsidiary" was a majority-owned and controlled subsidiary of the U.S. Issuer headquartered in India that built and operated renewable-energy projects in India. The U.S. Issuer's Subsidiary was an "agent" of an issuer, the U.S. Issuer, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a), until approximately April 2024. For purposes of sections IV through V of this Indictment only, the term "U.S. Issuer" encompasses the "U.S. Issuer," the "U.S. Issuer's Subsidiary" and the other wholly or majority-owned subsidiaries of the two entities.

6. The "Canadian Investor" was an institutional investor headquartered in Canada that managed funds for Canadian public retirement and insurance plans.

7. The "Canadian Investor's Subsidiary" was a wholly-owned subsidiary of the Canadian Investor. The Canadian Investor's Subsidiary was the U.S. Issuer's majority stockholder.

C.     The Defendants

8. The defendant GAUTAM S. ADANI was a citizen of India who resided in India. GAUTAM S. ADANI was the Founder of the Conglomerate. The Conglomerate included numerous portfolio companies, including the Indian Energy Company. GAUTAM S. ADANI served as the Chairman and as a Non-Executive Director of the Indian Energy Company's Board of Directors.

9. The defendant SAGAR R. ADANI was a citizen of India who resided in India and was the defendant GAUTAM S. ADANI's nephew. From approximately October

3

2018 through the present, SAGAR R. ADANI was the Executive Director of the Indian Energy Company's Board of Directors.

10.    The defendant VNEET S. JAAIN was a citizen of India who resided in India. From approximately July 2020 through May 2023, JAAIN was the Chief Executive Officer ("CEO") of the Indian Energy Company. From approximately July 2020 through the present, JAAIN was the Managing Director of the Indian Energy Company's Board of Directors.

11.    The defendant RANJIT GUPTA was a citizen of India who resided in India. From approximately July 2019 through April 2022, GUPTA was the CEO of the U.S. Issuer and the CEO and Managing Director of the U.S. Issuer's Subsidiary. GUPTA was an "officer," "employee" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12.    The defendant CYRIL CABANES was a citizen of Australia and France who resided in Singapore. From approximately February 2016 through October 2023, CABANES was employed by a company associated with the Canadian Investor and, from approximately January 2017 through October 2023, was a Non-Executive Director of the Boards of Directors of the U.S. Issuer and the U.S. Issuer's Subsidiary. CABANES was a "director" of an issuer, the U.S. Issuer, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.    The defendant SAURABH AGARWAL was a citizen of India who resided in India. From approximately May 2017 through July 2023, SAURABH AGARWAL was employed by a company associated with the Canadian Investor and reported to the defendant

CYRIL CABANES. SAURABH AGARWAL was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(a).

14.     The defendant DEEPAK MALHOTRA was a citizen of India who resided in India. From approximately September 2018 through October 2023, MALHOTRA was employed by a company associated with the Canadian Investor and, from approximately November 2019 through October 2023, was a Non-Executive Director of the Boards of Directors of the U.S. Issuer and the U.S. Issuer's Subsidiary. MALHOTRA was a "director" of an issuer, the U.S. Issuer, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

15.     The defendant RUPESH AGARWAL was a citizen of India who resided in India. From approximately the spring of 2022 to July 2022, RUPESH AGARWAL was a consultant for the U.S. Issuer and the U.S. Issuer's Subsidiary. From approximately July 2022 to August 2022, RUPESH AGARWAL was the Chief Strategy and Commercial Officer for the U.S. Issuer and the U.S. Issuer's Subsidiary. From approximately August 2022 through July 2023, RUPESH AGARWAL was the acting CEO of the U.S. Issuer and the U.S. Issuer's Subsidiary. RUPESH AGARWAL was an "officer," "employee" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

D.      Relevant Individuals and Entities

16.     Co-Conspirator #1 was a citizen of the United Kingdom who resided in Hong Kong. From approximately October 2021 through October 2023, Co-Conspirator #1 was the Non-Executive Chairman of the U.S. Issuer's and the U.S. Issuer's Subsidiary's Boards of

Directors. Co-Conspirator #1 was a "director" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

17.     Co-Conspirator #2 was a citizen of India who resided in India. From approximately July 2019 through April 2022, Co-Conspirator #2 held high-ranking executive positions at the U.S. Issuer and the U.S. Issuer's Subsidiary. Co-Conspirator #2 was an "officer," "employee" and "agent" of an issuer, the U.S. Issuer, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18.     Foreign Official #1 was a citizen of India who resided in India. From approximately May 2019 through June 2024, Foreign Official #1 served as a high-ranking government official of Andhra Pradesh, India. Foreign Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

19.     The Solar Energy Corporation of India ("SECI") was a company of the Ministry of New and Renewable Energy under the central government of India whose mission was, among other things, to increase the use of renewable-energy in India. SECI was state-owned and state-controlled and performed a function that India treated as its own. SECI was an "instrumentality" of the Indian government, and SECI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

20.     The country of India was comprised of numerous states and regions (also referred to as union territories), including Chhattisgarh, Tamil Nadu, Odisha, Jammu and Kashmir and Andhra Pradesh, which were governed by their own respective state and union

6

governments. Generally, the governing bodies of the states and union territories included a chief minister and council of ministers. These governing bodies were "department[s]" and "agenc[ies]" of the Indian government, and the officers and employees of these governing bodies were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

21. The Chhattisgarh State Power Distribution Company Limited, Tamil Nadu Generation and Distribution Corporation Limited, GRIDCO Limited, Jammu Kashmir Power Corporation Limited, Andhra Pradesh Central Power Distribution Corporation Limited, Andhra Pradesh Eastern Power Distribution Company Limited and Andhra Pradesh Southern Power Distribution Company Limited (collectively, the "State Distribution Companies") were electricity distribution companies in India that were state-owned and state-controlled and performed functions that the state governments in India treated as their own. The State Distribution Companies were "instrumentalities" of the Indian government, and their officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

II.    Terms and Definitions

22. A Power Sale Agreement ("PSA") was an agreement between an electricity distribution company and SECI, pursuant to which the electricity distribution company agreed to purchase solar power from SECI at certain negotiated rates.

23. A Power Purchase Agreement ("PPA") was an agreement between SECI and an energy producer, pursuant to which the energy producer agreed to supply energy to SECI at certain negotiated rates.

7

24. The Indian rupee ("INR") was the domestic currency of India.

25. A "lakh" was equivalent to 100,000 under Indian numbering conventions.

26. A "crore" was equivalent to 10 million, or 100 lakhs, under Indian numbering conventions.

27. A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

28. A "syndicated loan" was a loan arranged by one or more banks on behalf of a group of lenders, referred to as a syndicate, who worked together to provide funds for a single borrower.

29. A "facility agreement" was a loan agreement between a borrowing company and a lender or group of lenders that allowed the borrowing company to take out money from the loan periodically over an extended period of time.

30. A "bond" was a fixed-income instrument and investment product where investors lent money to a government or company at a certain interest rate for an amount of time. The entity repaid investors interest in addition to repaying the original face value of the bond.

31. Rule 144A of the Securities Act of 1933 provided a mechanism for the sale of securities, such as bonds ("Rule 144A Bonds"), that were privately placed to qualified institutional buyers ("QIBs") in the United States and elsewhere.

32. An "offering circular" was a detailed document provided by an issuer of securities to potential investors containing important information about the issuer, its affiliates and the offered securities.

33.     A "bookrunner" was a financial institution responsible for managing and coordinating the issuance and sale of securities.  In the context of Rule 144A Bonds, a bookrunner, among other things, collaborated with the issuer to determine the appropriate price and structure of the securities being offered, helped the issuer market the offering to potential investors, including through roadshows, and participated in allocating the securities to investors. Multiple bookrunners on a transaction were referred to as "joint bookrunners."

34.     A "subscription agreement" was a legal document used in the process of issuing securities.  In the context of Rule 144A Bonds, a subscription agreement served as a contract between an issuer and a bookrunner or joint bookrunners, outlining the terms and conditions under which the bookrunners agree to market and distribute the issuer's securities.

35.     An "integrated annual report" was a comprehensive report that included financial and non-financial information about an organization to provide an overall view of the organization's performance, strategy, governance and future prospects.  Investors and potential investors used annual reports to evaluate a company's financial performance and to make investment decisions.

III.    The Foreign Corrupt Practices Act

36.     The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

IV.    Overview of the Criminal Schemes

A.    The Bribery and Obstruction Schemes

37.    Beginning in or about 2020, defendant RANJIT GUPTA and Co-Conspirator #2, while acting within the scope of their employment as officers, employees and agents of the U.S. Issuer, knowingly and willfully conspired and agreed with each other and others, including but not limited to the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, to corruptly offer, authorize, promise to pay and to pay bribes to and for the benefit of government officials in India to cause Indian state electricity distribution companies to enter into contracts with SECI in order for the Indian Energy Company, the Indian Energy Company's subsidiaries and the U.S. Issuer to obtain and retain business. At various times in or about and between 2021 and 2022, other individuals, including but not limited to the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1, knowingly and willfully joined the conspiracy.

38.    To accomplish the objectives of the then ongoing illegal bribery scheme, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1, together with others, also agreed knowingly and corruptly to conceal the scheme from the United States government, including by obstructing an investigation by a grand jury in the Eastern District of New York (the "Grand Jury Investigation"), an investigation by the Federal Bureau of Investigation (the "FBI Investigation") and an investigation by the SEC (the "SEC Investigation") (collectively, the "Government Investigations"). As part of that scheme, beginning in approximately 2022, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 agreed

10

with each other and others to destroy and suppress documents and communications and provide false information to the United States government in connection with the Government Investigations.

### B.    The Securities Fraud and Wire Fraud Schemes

39.    In or about and between 2020 and 2024, in order to fund its operations, the Indian Energy Company and certain of its subsidiaries engaged in a series of financial transactions, including: (i) obtaining more than $2 billion of United States-dollar denominated bank loans from international financial institutions and United States-based asset management companies; and (ii) offering more than $1 billion in securities underwritten by international financial institutions and marketed and sold to investors in the United States, among other places. In connection with these financial transactions, investors irrevocably committed themselves in the United States to invest millions of dollars in the securities of the Indian Energy Company.

40.    In connection with these transactions, the Indian Energy Company and its directors, management team and employees, including the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, made or caused others to make false and misleading statements, and omitted material facts that rendered certain statements misleading, to investors, joint bookrunners and lenders regarding the Indian Energy Company's anti-bribery commitments and practices and the bribery scheme described herein.

41.    The Indian Energy Company and its directors, management team and employees, including the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, relied on the United States financial system to perpetuate this fraudulent scheme by, among other things, seeking and securing investors and potential investors physically located in

11

the United States and causing wires to be sent and received that passed through the United States, including through the Eastern District of New York.

V.    The Conspiracies to Violate the FCPA and Obstruct Justice

A.    The Corrupt Solar Project

42.    In or about and between December 2019 and July 2020, the U.S. Issuer and the Indian Energy Company's subsidiary won and were issued letters of award ("LOAs") for a manufacturing-linked solar tender offered by SECI (the "Manufacturing Linked Project"). As part of that award, the U.S. Issuer agreed to supply four gigawatts of solar power to SECI, and the Indian Energy Company's subsidiary agreed to supply eight gigawatts of solar power to SECI. SECI, in turn, was responsible for finding state electricity distribution companies that would purchase the 12 gigawatts of power that the Indian Energy Company's subsidiary and the U.S. Issuer had agreed to supply.

43.    The terms of the LOAs and amended LOAs obligated SECI to purchase solar power from the U.S. Issuer and the Indian Energy Company's subsidiaries at a fixed rate.

44.    At the time of its award, the size and scope of the Manufacturing Linked Project was among the largest global solar energy projects. The Manufacturing Linked Project more than doubled the capacity of renewable-power under the Indian Energy Company's and the U.S. Issuer's portfolios. After the award, the Indian Energy Company issued a media release titled, "[the Indian Energy Company] Wins the World's Largest Solar Award," which included a statement from the defendant GAUTAM S. ADANI that the Indian Energy Company was "honoured to be selected by SECI for this landmark solar award." Similarly, following the award, the U.S. Issuer published a media release announcing its four-gigawatt award as a part of

"one of the largest solar projects ever awarded globally," which included a statement from the defendant RANJIT GUPTA that "[w]ith this award, [the U.S. Issuer] will have a large pipeline of over 4 GW for an extended period of time."

45.     The Manufacturing Linked Project was anticipated to generate considerable profits for its energy producers. For example, the U.S. Issuer anticipated that, over approximately 20 years, the Manufacturing Linked Project would generate more than $2 billion in profits after tax.

B.     The Mechanics of the Bribery Scheme

    i.     GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN, RANJIT GUPTA and Co-Conspirator #2 Promise to Pay Bribes to Government Officials

46.     The high energy prices contemplated in the LOAs made it difficult for SECI to find Indian state buyers of energy under the Manufacturing Linked Project. After the award of the Manufacturing Linked Project, SECI unsuccessfully sought out Indian state and union governments to purchase the 12 gigawatts of solar power pursuant to PSAs. Without PSAs to sell the energy to a state buyer, SECI would not enter into corresponding PPAs to purchase power from the Indian Energy Company's subsidiaries or the U.S. Issuer.

47.     SECI's inability to find purchasers jeopardized the lucrative LOAs, and corresponding revenue, that the Indian Energy Company's subsidiary and the U.S. Issuer anticipated receiving from the Manufacturing Linked Project. As a result, in or about 2020, the defendants GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN, RANJIT GUPTA and Co-Conspirator #2, among others, devised a scheme to offer, authorize, make and promise to make bribe payments to Indian government officials in exchange for the government officials

causing state electricity distribution companies to enter into PSAs with SECI, which would allow the Indian Energy Company's subsidiaries and the U.S. Issuer to secure PPAs with SECI (the "Bribery Scheme"). GUPTA and Co-Conspirator #2 agreed that the U.S. Issuer would pay for a portion of the promised bribes.

48.     During the course of the Bribery Scheme, the co-conspirators undertook extensive efforts to corruptly persuade government officials to cause state electricity distribution companies to execute PSAs and frequently discussed those efforts amongst themselves, including through the use of an electronic messaging application. In addition, the defendant GAUTAM S. ADANI personally met with Foreign Official #1 in Andhra Pradesh to advance the execution of a PSA between SECI and Andhra Pradesh's state electricity distribution companies, including on or about August 7, 2021, on or about September 12, 2021 and on or about November 20, 2021.

49.     In furtherance of the Bribery Scheme, the co-conspirators, through GAUTAM S. ADANI, SAGAR R. ADANI, VNEET S. JAAIN and others, had offered and promised to Indian government officials approximately 2,029 crore rupees (approximately $265 million)[2] in bribes in exchange for Indian government officials causing the state electricity distribution companies to execute PSAs under the Manufacturing Linked Project, which would benefit the Indian Energy Company's subsidiaries and the U.S. Issuer. Approximately 1,750 crore rupees (approximately $228 million) of the corrupt payments was offered to Foreign Official #1 in exchange for Foreign Official #1 causing Andhra Pradesh's state electricity

---

[2]     Unless otherwise noted, all U.S. Dollar conversions from INR are based on the approximate value of the INR to the U.S. Dollar in or about April 2022.

14

distribution companies to agree to purchase seven gigawatts of solar power from SECI under the Manufacturing Linked Project.

50.    Following the promise of bribes to Indian government officials, in or about and between July 2021 and February 2022, electricity distribution companies for the states and regions of Odisha, Jammu and Kashmir, Tamil Nadu, Chhattisgarh and Andhra Pradesh entered into PSAs with SECI under the Manufacturing Linked Project. Andhra Pradesh's electricity distribution companies entered into a PSA with SECI on or about December 1, 2021, pursuant to which the state agreed to purchase approximately seven gigawatts of solar power— by far the largest amount of any Indian state or region.

51.    With executed PSAs under the Manufacturing Linked Project, SECI could enter into corresponding PPAs to purchase solar power from the Indian Energy Company's subsidiaries and the U.S. Issuer. In or about and between October 2021 and February 2022, the U.S. Issuer and the Indian Energy Company, through subsidiaries, executed PPAs with SECI. Pursuant to the PPAs, the U.S. Issuer agreed to supply SECI with approximately 650 megawatts of solar power for the Indian states and region of Chhattisgarh, Tamil Nadu, Odisha and Jammu and Kashmir (collectively, the "650 MW PPAs") and approximately 2.3 gigawatts of solar power for the Indian state of Andhra Pradesh (the "2.3 GW PPAs"). Subsidiaries for the Indian Energy Company, likewise, executed their own PPAs with SECI under which the subsidiaries agreed to supply SECI with solar power for the Indian states and region of Chhattisgarh, Tamil Nadu, Odisha, Jammu and Kashmir and Andhra Pradesh. Following the execution of the Andhra Pradesh-linked PPAs by the Indian Energy Company's subsidiaries, the Indian Energy Company

issued a press release quoting GAUTAM S. ADANI, who touted the signing of "the world's largest PPA with SECI."

52.     During and in furtherance of the Bribery Scheme, the defendant SAGAR R. ADANI used his cellular phone to track specific details of the bribes offered and promised to government officials (the "Bribe Notes"). The Bribe Notes identified: (i) the state or region for which government officials had been offered a bribe; (ii) the total amount of the offered bribe; and (iii) the approximate amount of solar power the state or region would agree to purchase in exchange for the bribe. In most instances, the Bribe Notes also identified the per megawatt rate for the total bribe amount offered, the abbreviated titles of the government officials who would receive the bribes, and/or the allocation of the total bribe amount among government officials within each state and region.

ii.     CYRIL CABANES, SAURABH AGARWAL and DEEPAK MALHOTRA Learn of the Bribery Scheme

53.     Before the U.S. Issuer entered into the 2.3 GW PPAs to supply solar power for Andhra Pradesh, during a meeting in India, the defendants SAURABH AGARWAL and DEEPAK MALHOTRA learned from the defendant RANJIT GUPTA and Co-Conspirator #2 about payments to be made to secure the Andhra Pradesh-linked PPAs for the U.S. Issuer and subsidiaries of the Indian Energy Company. SAURABH AGARWAL and MALHOTRA shared that information with the defendant CYRIL CABANES.

54.     Approximately five days later, on or about December 16, 2021, the U.S. Issuer executed the 2.3 GW PPAs.

iii.    The Co-Conspirators' Corrupt Efforts to Pay the Indian Energy Company

55.    On or about April 25, 2022, the defendants GAUTAM S. ADANI, VNEET S. JAAIN, RANJIT GUPTA and Co-Conspirator #2 were scheduled to meet in New Delhi, Delhi, India to discuss the Bribery Scheme. In anticipation of the meeting, JAAIN used his cellular phone to photograph a document summarizing the amounts the U.S. Issuer owed the Indian Energy Company for its respective portion of the bribes promised by the Indian Energy Company on behalf of the U.S. Issuer. The summary reflected that the U.S. Issuer owed the Indian Energy Company: (i) 55 crore rupees (approximately $7 million) for the bribes that were promised to secure the 650 MW PPAs; and (ii) 583 crore rupees (approximately $76 million) for the bribes that were promised to secure the 2.3 GW PPAs.

56.    However, also on or about April 25, 2022, the U.S. Issuer's Board of Directors asked the defendant RANJIT GUPTA and Co-Conspirator #2 to resign from their positions, which they did. The next day, on or about April 26, 2022, the U.S. Issuer publicly announced RANJIT GUPTA's and Co-Conspirator #2's resignations from their executive positions.

57.    On or about April 27, 2022, the defendant GAUTAM S. ADANI contacted the defendant SAURABH AGARWAL to request a meeting with the U.S. Issuer's new leadership. Following his communications with GAUTAM S. ADANI, the defendants CYRIL CABANES and SAURABH AGARWAL directed the defendant RUPESH AGARWAL and Co-Conspirator #1 to attend a meeting with GAUTAM S. ADANI in Ahmedabad, Gujarat, India on behalf of the U.S. Issuer.

17

58.     On or about April 29, 2022, the defendant RUPESH AGARWAL and Co-Conspirator #1 met with the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN at the Conglomerate's corporate office in Ahmedabad, Gujarat, India.  During the meeting, GAUTAM S. ADANI detailed aspects of the Bribery Scheme, including, among others: (i) the corrupt agreement with the defendant RANJIT GUPTA and Co-Conspirator #2 to secure relevant contracts under the Manufacturing Linked Project through bribe payments to Indian government officials; (ii) that the Canadian Investor had approved the corrupt agreement; (iii) that, for its share of the bribe payments, the U.S. Issuer owed GAUTAM S. ADANI 25 lakh rupees per megawatt of power for securing the 2.3 GW PPAs and 55 crore rupees for securing the 650 MW PPAs; and (iv) steps GAUTAM S. ADANI personally took to offer bribes to Indian government officials.  In addition, GAUTAM S. ADANI presented multiple options by which the U.S. Issuer could conceal satisfaction of its portion of the bribe payments, including by transferring the 2.3 GW PPAs from the U.S. Issuer to the Indian Energy Company or its subsidiaries.

59.     Following the April 29, 2022 meeting, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 planned how the U.S. Issuer would pay for the portion of bribe payments that the Indian Energy Company had promised to make on the U.S. Issuer's behalf.  As discussed further below, to further the Bribery Scheme, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 also agreed to hide their own involvement in the Bribery Scheme.

60.     To help the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 determine which corrupt payment option was best, RUPESH AGARWAL prepared multiple analyses using PowerPoint and Excel.  One of the PowerPoints prepared by RUPESH AGARWAL summarized the options, described as "Commercial proposal[s]," that the defendant GAUTAM S. ADANI had suggested, including the U.S. Issuer: (i) directly paying the Indian Energy Company the amounts owed to GAUTAM S. ADANI, described as a "Development Fee"; (ii) transferring all of its Manufacturing Linked Project PPAs to the Indian Energy Company; (iii) transferring only the 2.3 GW PPAs to the Indian Energy Company; and (iv) entering into a joint venture with the Indian Energy Company whereby the Indian Energy Company would build and operate the U.S. Issuer's projects.  That PowerPoint also contemplated transferring the 2.3 GW PPAs to the Indian Energy Company and paying the Indian Energy Company a $7.3 million "fee" in connection with the 650 MW PPAs, which PPAs the U.S. Issuer would continue to retain and develop under the Manufacturing Linked Project.

61.     The corrupt payment analyses prepared by the defendant RUPESH AGARWAL described a coordinated effort by the Indian Energy Company and the U.S. Issuer to facilitate the transfer of the 2.3 GW PPAs to the Indian Energy Company and stated that, where regulatory approval was required from SECI, the defendant GAUTAM S. ADANI would obtain the approval.

62.     During the course of the Bribery Scheme, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, regularly communicated about and in furtherance of the corrupt scheme,

19

including via electronic messaging, some of which communications occurred while CABANES, SAURABH AGARWAL and Co-Conspirator #1 were in the United States.

63.    When communicating about the Bribery Scheme, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 often referred to the defendants GAUTAM S. ADANI and VNEET S. JAAIN by code names. Specifically, among other things, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 referred to GAUTAM S. ADANI as "SAG," "Mr[.] A," "Numero uno" and "the big man," and referred to JAAIN as "V," "snake" and "Numero uno minus one."

64.    On or about June 14, 2022, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN met with the defendant RUPESH AGARWAL and Co-Conspirator #1 at the Conglomerate's corporate office in Ahmedabad, Gujarat, India. Prior to the meeting, Co-Conspirator #1 discussed with the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL a plan to return the 2.3 GW PPAs to SECI as a way to transfer value to the Indian Energy Company to satisfy a portion of the U.S. Issuer's bribes. As a result, at the meeting, Co-Conspirator #1 told GAUTAM S. ADANI that the U.S. Issuer would return the 2.3 GW PPAs to SECI, with the understanding that the Indian Energy Company or its subsidiary would acquire the project for itself, thereby satisfying a portion of the U.S. Issuer's bribes. Co-Conspirator #1 also agreed that the U.S. Issuer would pay the Indian Energy Company its portion—approximately $7 million—of the bribe payments promised by the Indian Energy Company to Indian government officials to secure the 650 MW

PPAs, which corrupt payment would facilitate the U.S. Issuer's retention of the remaining portions of the Manufacturing Linked Project.

65.    Thereafter, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, worked to implement the transfer of the 2.3 GW PPAs to the Indian Energy Company and to identify a means to transfer millions of dollars to the Indian Energy Company while the U.S. Issuer retained the 650 MW PPAs.

iv.    The Corrupt Transfer of the 2.3 GW PPAs to the Indian Energy Company's Subsidiary

66.    The defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, needed approval from the U.S. Issuer's Boards of Directors to transfer the valuable 2.3 GW PPAs to the Indian Energy Company and/or its subsidiary.  To do so, they contrived pretextual reasons to return the 2.3 GW PPAs to SECI, which they presented to the U.S. Issuer's Boards of Directors.  Specifically, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator # 1 claimed that the need to return the 2.3 GW PPAs to SECI was based on then-ongoing litigation regarding the project and deteriorating economics, which reasons were meant to obfuscate the true reason the U.S. Issuer was returning the projects to SECI.  CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 also concealed from the Boards of Directors and others to whom they reported the corrupt monies they had agreed to pay to the Indian Energy Company for the bribes promised to secure the 650 MW PPAs.  On or about November 22, 2022, the U.S. Issuer's Board of Directors authorized

sending a letter to SECI to begin discussions about the U.S. Issuer withdrawing from the 2.3 GW PPAs.

67.     The defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, who were secretly directing the U.S. Issuer's return of the 2.3 GW PPAs to SECI, kept each other apprised of the progress on the project's return.  The same day that the U.S. Issuer's Board of Directors authorized the letter to SECI, on or about November 22, 2022, SAGAR R. ADANI sent an electronic message to GAUTAM S. ADANI stating that "24th (Thursday) there is [a] board meeting in [the U.S. Issuer] where they are expected to approve the final letter to be sent to SECI. We will keep close track and chase it up properly."  GAUTAM S. ADANI responded to the message, "Ok."

68.     On or about December 7, 2022, the U.S. Issuer sent a letter to SECI requesting a meeting with SECI to discuss the 2.3 GW PPAs.

69.     The following day, on or about December 8, 2022, SAGAR R. ADANI sent an electronic message to GAUTAM S. ADANI stating that the U.S. Issuer "has finally submitted letter to SECI today . . . . Will follow for next steps closely."

70.     The defendants SAGAR R. ADANI and VNEET S. JAAIN and other Indian Energy Company personnel also secretly influenced the SECI process for reallocation of the 2.3 GW PPAs to the Indian Energy Company's subsidiary, including by directing the U.S. Issuer's submissions to SECI and by obtaining and revising internal SECI documents.

71.     On or about March 18, 2024, SECI sent letters to the U.S. Issuer terminating the 2.3 GW PPAs, authorizing reallocation of the 2.3 GW PPAs to the Indian Energy

Company's subsidiary and affirming the U.S. Issuer's obligation to continue developing the 650 MW PPAs.

72.     On or about March 28, 2024, as of which time the defendants RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA, and RUPESH AGARWAL and Co-Conspirator #1 and Co-Conspirator #2 were no longer employed by the U.S. Issuer and companies associated with the Canadian Investor, the U.S. Issuer publicly announced, among other things, that it was withdrawing from the 650 MW PPAs.

C.     The Obstruction Scheme

73.     On or about March 17, 2022, as part of the SEC Investigation, the SEC sent a "general inquiry" request to the U.S. Issuer, which included requests for information about all contracts the U.S. Issuer had bid on and/or won since 2018, FCPA complaints and investigations and the solicitation of anything of value by or on behalf of foreign government officials.

74.     On or about March 25, 2022, Co-Conspirator #1 sent an electronic message to the defendants CYRIL CABANES, SAURABH AGARWAL and DEEPAK MALHOTRA alerting them that the U.S. Issuer had received an "SEC enquiry . . . about what we have bid for/ won/ agents/ any compliance enquiry and any FCPA enquiry." Several days later, on or about March 29, 2022, the defendant RANJIT GUPTA also sent an electronic message to MALHOTRA attaching the SEC's inquiry to the U.S. Issuer, which letter MALHOTRA then sent to CABANES and SAURABH AGARWAL. SAURABH AGARWAL responded to the message, in part, "We need the management to confirm the FCPA related statements that will be released as a response."

23

75.     To accomplish the objectives of the ongoing Bribery Scheme, beginning in or about 2022, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, agreed to suppress documents, conceal information and provide false information to the United States government for the purpose of obstructing, influencing and interfering with the Government Investigations (the "Obstruction Scheme").

76.     To create the false appearance of transparency and good governance, in or about August 2022, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, caused the U.S. Issuer's Board of Directors to initiate an internal investigation run by a law firm headquartered in the United States and supervised by a sub-committee of the Board of Directors.  Part of the Obstruction Scheme was to withhold key information about the Bribery Scheme, including the plan to pay millions of dollars to the Indian Energy Company in connection with the 650 MW PPAs that were to be retained by the U.S. Issuer, from the internal investigation and the Government Investigations.  In addition, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 made and agreed to make certain selective disclosures in connection with the internal investigation and the Government Investigations— namely, revealing the defendants GAUTAM S. ADANI's, SAGAR R. ADANI's and VNEET S. JAAIN's requests for bribe money but concealing their own participation in the Bribery Scheme. This strategy was designed to create the appearance that the co-conspirators were reporting misconduct rather than perpetrating misconduct, which, in turn, aided the co-conspirators'

continued efforts to further the ongoing Bribery Scheme and to conceal the true nature of the Bribery Scheme from the Board of Directors and the Government Investigations.

77.    In or about and between 2022 and the present, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, and Co-Conspirator #1, took numerous additional steps to conceal their participation in the Bribery Scheme and interfere with the Government Investigations.  Specifically, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 destroyed and otherwise concealed evidence, including a PowerPoint analysis and electronic communications, thereby impairing the availability of records, documents, objects and other things for use in the Government Investigations.  In furtherance of the Obstruction Scheme:

(a)    In or about June 2022, SAURABH AGARWAL and CABANES agreed to delete electronic messages they had exchanged about what they would report to the Canadian Investor and the Canadian Investor's Subsidiary about the Bribery Scheme.

(b)    In or about early August 2022, Co-Conspirator #1 discussed with MALHOTRA and RUPESH AGARWAL the deletion of incriminating electronic materials, including emails, electronic messages and a PowerPoint analysis detailing options for how the U.S. Issuer could compensate the Indian Energy Company for its portion of the bribes.

(c)    On or about September 30, 2022, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 agreed to conceal their agreement to pay the defendant GAUTAM S. ADANI in connection with Bribery Scheme.

78.    In or about and between March 2023 and July 2023, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 met

with representatives from the FBI, Department of Justice ("DOJ"), and SEC in Brooklyn, New York and, in furtherance of the Bribery Scheme, falsely denied their participation in the Bribery Scheme.

VI.    The Fraud Scheme

79.    In or about and between 2020 and 2024, while engaged in the Bribery Scheme, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN were simultaneously engaged in a scheme to obtain United States dollar-denominated financing for the Indian Energy Company and its subsidiaries, including from investors located in the United States, on the basis of false and misleading statements, as well as material omissions that rendered certain statements misleading, regarding the Indian Energy Company's involvement in the Bribery Scheme and its anti-bribery commitments and practices (the "Fraud Scheme").

80.    To obtain such financing, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN approved financial transactions entered into by the Indian Energy Company and its subsidiaries, including: (i) United States dollar-denominated syndicate loans from lender groups comprised of international financial institutions and United States-based investors; and (ii) Rule 144A bond offerings underwritten by international financial institutions, which were marketed and sold to investors in the United States, among other places. Necessary documents for each of these financings contained false and misleading statements about whether the Indian Energy Company engaged in bribery and the Indian Energy Company's overall commitment to anti-corruption principles and good governance.

81.    The false statements, misrepresentations and material omissions that the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN made and caused

26

others to make induced investors to purchase bonds and financial institutions to lend money pursuant to terms and at prices that did not account for the true risk associated with the transactions, among other potential consequences of providing capital to the Indian Energy Company or its subsidiaries, when the Indian Energy Company and its principals were engaged in the Bribery Scheme.

82.    The defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN had direct control over the Indian Energy Company's ability to raise capital.  On or about July 10, 2020, the Board of Directors of the Indian Energy Company passed a resolution reconstituting its "Management Committee" and vesting certain powers in the Management Committee (the "Indian Energy Company Board Resolution").  The four-member Management Committee included GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN.  Powers vested in the Management Committee included, among others, the powers to borrow funds from banks and/or other financial institutions, make investments in subsidiary or joint venture companies and issue securities.

83.    In addition to authorizing fraudulent financial transactions, the defendants GAUTAM S. ADANI and SAGAR R. ADANI took other actions in furtherance of the Fraud Scheme.  For example, in or about and between 2020 and 2023, GAUTAM S. ADANI and SAGAR R. ADANI traveled to the United States to meet with prospective financial partners and investors for the purpose of maintaining and improving the Conglomerate's and the Indian Energy Company's access to United States-based capital.

84.    Additionally, in connection with the publication of news articles regarding the United States government's investigation into the Bribery Scheme, the defendants GAUTAM

S. ADANI and SAGAR R. ADANI made or caused others to make false and misleading statements publicly and privately to financial institutions about the Bribery Scheme and the Indian Energy Company's knowledge and awareness of the United States government's investigation into the Bribery Scheme.

    A.    <u>The 2021 Fraudulent Financial Transactions</u>

        i.    <u>The 2021 Syndicate Loan</u>

85.    On or about March 5, 2021, four wholly-owned subsidiaries of the Indian Energy Company ("the 2021 Project Companies"), which were established to develop certain of the Indian Energy Company's renewable-energy projects, raised a total of $1.35 billion in a United States-dollar denominated senior secured debt facility (the "2021 Syndicate Loan") from the international branches of a group of global financial institutions (the "2021 Lenders").

86.    In connection with the 2021 Syndicate Loan, on or about March 5, 2021, the 2021 Project Companies entered into a facility agreement with the 2021 Lenders (the "2021 Facility Agreement"). The 2021 Facility Agreement contained false and misleading statements about the Indian Energy Company's anti-bribery practices and policies. For example, the 2021 Facility Agreement included a false and misleading representation that neither the 2021 Project Companies, nor any affiliates, which included the Indian Energy Company, or their representatives had taken or would take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any government official to influence official action or secure an improper advantage.

87.    The defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN authorized the 2021 Syndicate Loan while engaged in the Bribery Scheme, which, as described above, included promises to pay government officials to influence official action and/or secure an improper advantage. On or about March 1, 2021, just prior to finalizing the 2021 Syndicate Loan, Individual #1, the company secretary of the Indian Energy Company, certified a copy of the operative July 2020 Indian Energy Company Board Resolution, demonstrating that GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN maintained the authority to approve the 2021 Syndicate Loan, which resolution was provided to the 2021 Lenders in connection with the loan.

88.    On or about December 6, 2021, one of the 2021 Lenders ("Financial Institution #1") sold from its Hong Kong branch approximately $70 million of its $325 million commitment of the 2021 Syndicate Loan through two asset management companies, one of which was headquartered in New York (the "Asset Managers").

89.    Prior to the sale, the Asset Managers undertook a due diligence process, which included a review of the 2021 Facility Agreement containing the false and misleading statements about the Indian Energy Company's anti-bribery practices and policies described above.

90.    Access to the U.S. dollar-denominated loan funds required collecting, sending and receiving wires within and through the United States, including through the Eastern District of New York. To access the 2021 Syndicate Loan funds, the 2021 Project Companies issued utilization requests to a financial institution designated as the "agent" bank among the 2021 Lenders ("Financial Institution #2"). Financial Institution #2 collected loan funds from the

2021 Lenders in a bank account at the New York branch of Financial Institution #2 and subsequently wired the funds to another financial institution in the United States for onward remittance to the 2021 Project Companies.

        ii.     The 2021 144A Bond

91.     On or about September 8, 2021, the Indian Energy Company issued $750 million in senior secured notes due 2024 (the "2021 144A Bond"). The 2021 144A Bond was marketed and offered to QIBs in the United States pursuant to Rule 144A of the Securities Act of 1933. In connection with the 2021 144A Bond, potential investors electronically received an offering circular ("the 2021 Bond Circular"), a document that included information about, among other things, the Conglomerate, the Indian Energy Company, the 2021 144A Bond, identified risk factors, the 2021 Syndicate Loan, the Indian Energy Company's Board of Directors and senior management, the Indian Energy Company's principal shareholders and a description of the Indian Energy Company's approximate 20 gigawatt portfolio, eight gigawatts of which was the corrupt Manufacturing Linked Project.

92.     The 2021 144A Bond raised money for the Indian Energy Company's ongoing projects, including the corrupt Manufacturing Linked Project. In the 2021 Bond Circular and in marketing materials, the Indian Energy Company identified to investors the use of proceeds for the 2021 144A Bond as capital expenditure requirements for the Indian Energy Company's under-construction projects at various stages of development, including the corrupt Manufacturing Linked Project.

93.     The defendants SAGAR R. ADANI and VNEET S. JAAIN reviewed and approved the 2021 Bond Circular, which contained false and misleading assurances about the

Indian Energy Company's anti-bribery practices and policies and its commitment to such principles, purportedly backed by robust internal compliance measures. For example, the 2021 Bond Circular touted the Indian Energy Company's risk management committee's oversight of anti-corruption and anti-bribery related matters. SAGAR R. ADANI and JAAIN, who at the time of the 2021 144A Bond offering were engaged in the Bribery Scheme, were members of the Indian Energy Company's risk management committee and were senior directors of the Indian Energy Company.

94.     To market and sell the 2021 144A Bond to investors, the Indian Energy Company engaged a group of global financial institutions as joint bookrunners (the "2021 Joint Bookrunners"). The Indian Energy Company and the 2021 Joint Bookrunners entered into a subscription agreement dated September 1, 2021 (the "2021 Subscription Agreement"). That 2021 Subscription Agreement included false and misleading representations regarding the Indian Energy Company's anti-bribery practices, including the false statement that the Indian Energy Company and its representatives had not taken and would not take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any government official to influence official action or secure an improper advantage. In the leadup to the bond pricing, the defendant SAGAR R. ADANI was included on multiple emails containing the draft and execution versions of the 2021 Subscription Agreement, as well as an email confirming the Indian Energy Company's signoff on the execution version of the 2021 Subscription Agreement.

31

95.     While actively engaged in the Bribery Scheme, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN authorized the Indian Energy Company to issue the 2021 144A Bond and make use of the proceeds.

96.     On or about August 26, 2021, the defendants SAGAR R. ADANI and VNEET S. JAAIN, as members of the Management Committee of the Indian Energy Company, passed a resolution authorizing the Indian Energy Company to issue securities in the amount of $750 million.  This resolution also set forth certain authorized signatories, including SAGAR R. ADANI and JAAIN, who were permitted to, among other things, execute all relevant transaction documents in furtherance of the 2021 144A Bond offering on behalf of the Indian Energy Company.

97.     Following the 2021 144A Bond issuance, in or about November 2021, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN each approved a formal Indian Energy Company "Note for Approval" authorizing the Indian Energy Company to make use of the 2021 144A Bond proceeds and pass any necessary Board of Director resolutions.

98.     The defendant SAGAR R. ADANI also played a key role in managing the 2021 144A Bond offering process and concealed the ongoing Bribery Scheme from the 2021 Joint Bookrunners and investors.  For example, on or about July 30, 2021, the 2021 Joint Bookrunners conducted a due diligence session with the Indian Energy Company management to assist in the preparation of the 2021 Bond Circular and ensure that all material disclosures were made.  The 2021 Joint Bookrunners emailed a due diligence questionnaire in advance of the session to SAGAR R. ADANI, among others.  The questionnaire included queries about FCPA compliance and whether the Indian Energy Company and its directors or officers, among others,

32

had made any unlawful payments to government officials.  Following the session, the 2021 Joint Bookrunners concluded that the 2021 144A Bond posed no anti-bribery-related issues and proceeded with the 2021 144A Bond issuance.  Additional due diligence sessions were conducted on or about August 27, 2021 and on or about September 1, 2021.

99.    On or about September 8, 2021, in connection with final pre-launch due diligence efforts, counsel for the 2021 Joint Bookrunners emailed the defendant SAGAR R. ADANI, among others, seeking confirmation that none of the responses to the questions discussed during the due diligence sessions had changed and that the 2021 Bond Circular contained all information regarding the Indian Energy Company that was material.  On the same day, Individual #1 responded affirmatively, copying the defendant SAGAR R. ADANI, and further noting that there was "nothing else that the [2021 Joint Bookrunners], legal counsels or investors in the Notes should know that is not disclosed in the [2021 Bond Circular]."

100.    The defendant SAGAR R. ADANI was also involved in the marketing of the bond to investors.  He received draft roadshow presentations, represented the Indian Energy Company during telephonic roadshow meetings with investors and otherwise participated in the Indian Energy Company's engagement with potential investors in the United States and elsewhere.

101.    Numerous wires, such as electronic messages and financial wires, passed within and through the United States, including through the Eastern District of New York, in connection with the 2021 144A Bond.  For example, salespeople employed by the 2021 Joint Bookrunners and located in New York City sent and received electronic messages in connection

with marketing the bond. Ultimately, approximately one quarter of the $750 million 2021 144A Bond was allocated to United States-based investors.

B.    GAUTAM S. ADANI and SAGAR R. ADANI Learn of the United States Government's Investigation

102.    In or about March 2023, FBI special agents took steps in furtherance of the FBI Investigation and the Grand Jury Investigation that revealed the existence of those investigations, as well as certain crimes and individuals under investigation, to the defendant SAGAR R. ADANI, which information was shared with the defendant GAUTAM S. ADANI. Thereafter, in furtherance of the Fraud Scheme, SAGAR R. ADANI and GAUTAM S. ADANI made or caused others to make false and misleading statements regarding the Bribery Scheme to investors, potential investors and financial institutions.

103.    Specifically, on or about March 17, 2023, FBI special agents approached the defendant SAGAR R. ADANI in the United States and, pursuant to a judicially authorized search warrant, took custody of electronic devices in his possession. At the same time, FBI special agents provided SAGAR R. ADANI with a copy of the search warrant and served him with a grand jury subpoena. The search warrant identified offenses, individuals and entities under investigation by the United States government, specifically: violations of the FCPA, securities fraud, wire fraud and related conspiracies involving SAGAR R. ADANI and the defendants GAUTAM S. ADANI and VNEET S. JAAIN, as well as the Indian Energy Company. The search warrant further described certain evidence subject to seizure, including evidence "related to the payment of or an offer to pay, bribes, kickbacks or provide or offer to provide any other thing of value to Indian government officials in order to obtain or retain business advantages."

104.   On or about March 18, 2023, the defendant GAUTAM S. ADANI emailed himself photographs of each page of the search warrant executed and grand jury subpoena served on the defendant SAGAR R. ADANI.

105.   Thereafter, as discussed further below, despite knowing certain of the subject offenses and individuals under investigation by the United States government, the defendants GAUTAM S. ADANI and SAGAR R. ADANI not only concealed the Bribery Scheme from financial institutions and investors in the United States and elsewhere but also caused others to make false and misleading statements regarding their awareness and knowledge of the United States government's investigation and its subjects.

C.   The 2023-2024 Fraudulent Transactions

i.   The 2023 Syndicate Loan

106.   On or about December 5, 2023, five project companies, wholly-owned by the Indian Energy Company through a subsidiary ("the 2023 Project Companies"), which were established to develop certain of the Indian Energy Company's renewable-energy projects, raised a total of $1.36 billion in a United States dollar-denominated senior secured debt facility (the "2023 Syndicate Loan") from international branches of a group of global financial institutions (the "2023 Lenders"). The 2023 Project Companies were developing some of the solar projects for the corrupt Manufacturing Linked Project described above.

107.   In connection with the 2023 Syndicate Loan, the 2023 Project Companies entered into a facility agreement with the 2023 Lenders (the "2023 Facility Agreement"). The 2023 Facility Agreement contained false assurances about the Indian Energy Company's anti-bribery practices and policies, similar to those in the 2021 Facility Agreement described above.

108.    In or about and between November and December 2023, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN authorized the 2023 Syndicate Loan. Specifically, GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN each approved a formal "Note for approval" authorizing the terms of the 2023 Syndicate Loan, which stated that a breach of anti-corruption covenants would constitute a "Major Event of Default."

109.    To access the 2023 Syndicate Loan funds, the 2023 Project Companies issued utilization requests to Financial Institution #2, which served as the "agent" bank. Financial Institution #2 collected loan funds from the 2023 Lenders in a bank account at the New York branch of Financial Institution #2 and subsequently wired the funds to another financial institution for onward remittance to the 2023 Project Companies.

ii.    The 2024 144A Bond

110.    On or about March 12, 2024, three special purpose vehicles (the "2024 Project Companies")—each a wholly-owned subsidiary of a joint venture equally owned by the Indian Energy Company and another energy company—issued $409 million in senior secured notes due 2042 (the "2024 144A Bond"). The Indian Energy Company had management control over the joint venture and the 2024 Project Companies. The 2024 144A Bond was marketed and offered to QIBs in the United States pursuant to Rule 144A of the Securities Act of 1933. In connection with the 2024 144A Bond, potential investors electronically received an offering circular ("the 2024 Bond Circular"), a document that included information about, among other things, the Conglomerate, the Indian Energy Company, the 2024 Project Companies, the 2024 144A Bond, identified risk factors, the 2024 Project Companies' principal shareholders, the

Manufacturing Linked Project and a description of the Indian Energy Company's approximate 21 gigawatt portfolio, eight gigawatts of which was the corrupt Manufacturing Linked Project.

111.    The 2024 Bond Circular contained false and misleading assurances about, among other things, the Indian Energy Company's "corporate governance" and touted "maintaining transparency and compliance in every aspect of [the company's] operations." Additionally, the 2024 Project Companies entered into a subscription agreement with the joint bookrunners (the "2024 Joint Bookrunners") for the 2024 144A Bond (the "2024 Subscription Agreement"). The 2024 Subscription Agreement included false and misleading representations regarding the Indian Energy Company's anti-bribery and anti-corruption practices, similar to the 2021 Subscription Agreement described above.

112.    Moreover, the 2024 Project Companies provided written answers to a management due diligence questionnaire similar to the one used in connection with the 2021 144A Bond in advance of the issuance of the 2024 144A Bond. The answers contained false and misleading representations about the Indian Energy Company's anti-bribery practices.

113.    Numerous wires, such as electronic messages and financial wires, passed within and through the United States, including through the Eastern District of New York, in connection with the 2024 144A Bond. For example, salespeople employed by the 2024 Joint Bookrunners and located in New York City sent and received electronic messages in connection with marketing the bond. Ultimately, approximately one quarter of the $750 million 2024 144A Bond was allocated to United States-based investors.

37

D.    The False Statements in the Indian Energy Company Annual Reports

114.    Each year, from at least 2021 through 2024, the Indian Energy Company publicly released integrated annual reports (the "Reports"). As described above, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN served as executives and directors of the Indian Energy Company during this time. The Reports included false and misleading statements regarding the Indian Energy Company's anti-bribery practices.

115.    For example, the 2020 through 2023 Reports falsely stated that the Indian Energy Company had a "zero tolerance" policy for bribery and corruption, which policy was reviewed by its Board of Directors, when in fact defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, all of whom were members of the Indian Energy Company's Board of Directors, were personally engaged in the Bribery Scheme.

116.    In or about July 2024, the Indian Energy Company publicly released its integrated annual report for the 2023 through 2024 fiscal year (the "2023-2024 Report"), which also included false and misleading statements regarding the Indian Energy Company's anti-bribery practices. The 2023-2024 Report repeatedly expressed a commitment to "zero-tolerance" for bribery and corruption, including stating that the company's "Code of Conduct and Policy Commitment" included "Anti-Bribery & Anti-Corruption" commitments, namely that: "We maintain a zero-tolerance stance towards all forms of bribery and corruption, whether in government or government dealings. We shall cooperate with the governmental authorities in efforts to eliminate all forms of bribery, fraud, and corruption. Our employees, contractors and business partners are expected to refuse any request/any offer for a bribe or kickback and report such instances immediately to the concerned authorities within the organisation."

38

E.      The False Statements Relating to the United States Government's Investigation

117.    In furtherance of the Fraud Scheme, in connection with the publication of a news article regarding the United States government's investigation of the Bribery Scheme, the defendants GAUTAM S. ADANI and SAGAR R. ADANI made or caused other Conglomerate personnel to make false and misleading statements about the Indian Energy Company's awareness of the United States government's investigation and the Indian Energy Company's anti-bribery practices, including in: (i) public statements to the media and market; (ii) public statements to Indian stock exchanges; and (iii) private communications with financial institutions.

118.    Specifically, on or about March 15, 2024, a news organization published an article titled "US Probing Indian Billionaire Gautam Adani and His Group Over Potential Bribery," which, among other things, reported that the United States government was investigating "whether an Adani entity, or people linked to the company, were involved in paying officials in India for favorable treatment on an energy project . . . ." (the "2024 News Article"). As described above, the defendants GAUTAM S. ADANI and SAGAR R. ADANI were aware of the FBI Investigation and the Grand Jury Investigation, including because of the service of a grand jury subpoena and execution of a search warrant for electronic devices on SAGAR R. ADANI that permitted seizure of evidence of criminality by GAUTAM S. ADANI, SAGAR R. ADANI and the defendant VNEET S. JAAIN, among others. Despite GAUTAM S. ADANI's and SAGAR R. ADANI's knowledge of the investigations, and despite their orchestration of the Bribery Scheme, the 2024 News Article contained a quote from the Conglomerate that "[w]e are not aware of any investigation against our Chairman [GAUTAM S.

ADANI]" and that "[a]s a business group that operates with the highest standards of governance, we are subject to and fully compliant with anti-corruption and anti-bribery laws in India and other countries."

119.   On or about March 17, 2024, Individual #2, the head of corporate finance for the Conglomerate, sent an email to an employee of a financial institution ("Financial Institution #3"), which was both a lender for the 2021 Syndicate Loan and a joint bookrunner for the 2024 144A Bond, copying the defendant SAGAR R. ADANI, and writing that that the 2024 News Article was "baseless," "malicious," "defamatory" and that the Conglomerate "operates with the highest standards of governance," and is "subject to and fully compliant with anti-corruption and anti-bribery laws in India and other countries." On or about the same day, Individual #2 sent more than a dozen emails to other financial institutions and investors with similar or identical false statements, copying SAGAR R. ADANI.

120.   On or about March 19, 2024, Individual #2 emailed employees of Financial Institution #2, Financial Institution #3 and Financial Institution #4 letters that the Indian Energy Company had sent to the National Stock Exchange of India and BSE Limited, both Indian stock exchanges. The letters falsely stated, among other things, that the Indian Energy Company "has not received any notice from the Department of Justice of U.S. in respect of the allegation referred to in the [2024 News Article]" and that the Indian Energy Company was "aware of an investigation" into potential violations of United States anti-corruption laws by a "third party." Also included in the email were written responses to questions posed by the financial institutions about the subject matter of the 2024 News Article. The written responses falsely claimed that the Conglomerate and the Indian Energy Company had not received notice

40

of the United States government's investigation and included other false and misleading statements about the Bribery Scheme and the Indian Energy Company's and the Conglomerate's knowledge and awareness of the United States government's investigation.

121.    On or about March 20, 2024, employees of Financial Institution #3 participated in a due diligence call with outside legal counsel for the Conglomerate, during which call counsel further reiterated the false statements described above pertaining to the 2024 News Article.  During the call, employees of Financial Institution #3 asked whether the Indian Energy Company had knowledge of inquiries or investigations into the alleged bribery and corruption and specifically inquired as to whether language in the 2024 Bond Circular indicating that the Indian Energy Company was "subject to or exposed to present inquiries and investigations under the anti-bribery or anti-corruption laws of other countries" was intended to disclose facts about a United States government investigation into the Bribery Scheme.  In response, counsel for the Conglomerate made the following false and misleading statements, among others: (i) risk factor disclosures are "generally drafted widely"; (ii) the Indian Energy Company was aware of an investigation relating to a third party, but was unaware of the nature of that investigation or whether it impacted the Indian Energy Company; (iii) the Indian Energy Company had included the disclosure because it was in the same industry as the third party under investigation and had joined/adjacent land parcels; (iv) the Indian Energy Company had not received notice or communication from the DOJ with respect to an investigation into the Indian Energy Company; and (v) the DOJ had not sought to interview any company personnel.

122.    On or about July 25, 2024, employees of Financial Institution #3 had a follow-up call with Individual #2 regarding the 2024 News Article and the 2024 Bond Circular.

41

During the call, Individual #2 falsely stated, among other things, that: (i) no entity or individual within the Conglomerate had been approached by any United States authority in connection with any investigation into the Conglomerate or its affiliates; (ii) the Conglomerate was not aware of any such investigation; (iii) the Conglomerate was not aware of any misconduct; and (iv) the 2024 News Article was "behind them." Individual #2 indicated that the Conglomerate was not willing to provide further written representations about the same topic.

123. These false statements concealed both the United States government's investigation and the Bribery Scheme from investors and financial institutions, all to ensure the Conglomerate's and the Indian Energy Company's continued access to capital in the United States and elsewhere, in furtherance of the Fraud Scheme.

## COUNT ONE
(Conspiracy to Violate the FCPA)

124. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

125. In or about and between 2020 and 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, together with Co-Conspirator #1, Co-Conspirator #2 and others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a) being an officer, director, employee and agent of an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift,

promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person, while knowing that all or a portion of such money and thing of value would be offered, given and promised, directly and indirectly, to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof, to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof, to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the U.S. Issuer in obtaining and retaining business for and with, and directing business to the Indian Energy Company, the Indian Energy Company's subsidiaries, the U.S. Issuer, the U.S. Issuer's Subsidiary, subsidiaries of the U.S. Issuer's Subsidiary, the Canadian Investor, the Canadian Investor's Subsidiary and others, contrary to Title 15, United States Code, Section 78dd-1; and

(b)      while in the territory of the United States, corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person, while knowing that all or a portion of such money and thing of value would be offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of:

43

(i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist CABANES, SAURABH AGARWAL, Co-Conspirator #1 and others in obtaining and retaining business for and with, and directing business to the Indian Energy Company, the Indian Energy Company's subsidiaries, the U.S. Issuer, the U.S. Issuer's Subsidiary, subsidiaries of the U.S. Issuer's Subsidiary, the Canadian Investor, the Canadian Investor's Subsidiary and others, contrary to Title 15, United States Code, Section 78dd-3.

126.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants RANJIT GUPTA, CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, together with others, committed and caused the commission of, among others, the following:

OVERT ACTS

(a)    On or about November 24, 2020, GUPTA exchanged electronic messages with the defendant SAGAR R. ADANI regarding efforts to convince states to purchase power under the Manufacturing Linked Project, as a part of which GUPTA wrote, "the advantage we have is that the discoms are being motivated."

44

(b)     On or about March 30, 2021, GUPTA sent an electronic message to SAGAR R. ADANI asking, "any progress on our PSAs ??"

(c)     On or about April 29, 2022, RUPESH AGARWAL and Co-Conspirator #1 met with the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN in India, during which meeting they discussed the Bribery Scheme.

(d)     On or about May 6, 2022, CABANES, while in the United States, exchanged electronic messages with Co-Conspirator #1 about the Bribery Scheme, as a part of which CABANES asked Co-Conspirator #1 if there was "a commercially doable deal."

(e)     On or about May 6, 2022, SAURABH AGARWAL exchanged electronic messages with Co-Conspirator #1 about the Bribery Scheme, as a part of which SAURABH AGARWAL asked, "when do you think [RUPESH AGARWAL] is completing analysis?"

(f)     On or about May 12, 2022, SAURABH AGARWAL, while in the United States, exchanged electronic messages with Co-Conspirator #1, as a part of which Co-Conspirator #1 informed SAURABH AGARWAL that RUPESH AGARWAL had a meeting with the defendant VNEET S. JAAIN that same day and "Views exchanged. No resolution. Ball with [JAAIN] to review for next [meeting]." SAURABH AGARWAL responded with a thumbs-up emoji and "K."

(g)     On or about May 17, 2022, GUPTA sent an electronic message to SAURABH AGARWAL that stated, among other things, "Just wanted to let you know that since [Co-Conspirator #2] & i [sic] are not part of [the U.S. Issuer] any more, Adani would like to take up discussions related to the SECI Manufacturing [Linked Project] directly with you. We are

always available to help with the successful execution of this prestigious ppa for which, as you already know, close coordination with Adani will be required."

(h)    On or about May 28, 2022, SAURABH AGARWAL, while in the United States, had a call with the defendant GAUTAM S. ADANI about the Bribery Scheme.

(i)    On or about May 31, 2022, Co-Conspirator #1 exchanged electronic messages with CABANES, as a part of which Co-Conspirator #1 told CABANES that RUPESH AGARWAL had a "BAD" meeting with the defendants GATAUM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN and that RUPESH AGARWAL and MALHOTRA were "fleshing out our options."

(j)    On or about May 31, 2022, in response to the message referred to above in paragraph 126(i), CABANES sent an electronic message to Co-Conspirator #1 asking, "[s]o we have a potential deal on the table?"

(k)    On or about June 13, 2022, RUPESH AGARWAL used his personal email account to send a PowerPoint titled "1 SLIDE.pptx" that outlined a proposal to satisfy a portion of the corrupt payment to the Indian Energy Company by returning the 2.3 GW PPAs to SECI for ultimate "re-allocation" to the Indian Energy Company.

(l)    On or about June 14, 2022, RUPESH AGARWAL and Co-Conspirator #1 met with the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN in India, during which meeting RUPESH AGARWAL and Co-Conspirator #1 agreed that the U.S. Issuer and/or its subsidiaries would return the 2.3 GW PPAs to SECI to facilitate the Indian Energy Company's subsidiary's acquisition of the valuable 2.3 GW PPAs and, in

addition, that the U.S. Issuer and/or its subsidiaries would pay the Indian Energy Company, directly or indirectly, 550 million INR (approximately $7 million).

(m)    On or about June 23, 2022, CABANES sent an electronic message to Co-Conspirator #1, who was then located in the United States, about the return of the 2.3 GW PPAs to SECI, stating "Hi [Co-Conspirator #1], what's the plan with regards to the board decision on the PPAs?"

(n)    On or about September 30, 2022, CABANES, SAURABH AGARWAL, MALHOTRA, RUPESH AGARWAL and Co-Conspirator #1 had a virtual meeting, during which meeting they agreed to withhold information and provide false information related to the Bribery Scheme to investigators and the U.S. Issuer's Boards of Directors.

(o)    On or about March 29, 2023 and on or about May 18, 2023, Co-Conspirator #1 met with representatives of the United States government in Brooklyn, New York and made false statements about the Bribery Scheme.

(p)    On or about June 28, 2023, CABANES met with representatives of the United States government in Brooklyn, New York and made false statements about the Bribery Scheme.

(Title 18, United States Code, Sections 371, 3238 and 3551 et seq.)

COUNT TWO
(Securities Fraud Conspiracy)

127.    The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

47

128.     In or about and between 2021 through the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in the 2021 144A Bond and 2024 144A Bond, in connection with the purchase and sale of investments in the 2021 144A Bond and 2024 144A Bond, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

129.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did commit and cause the commission of, among others, the following:

<u>OVERT ACTS</u>

(a)    On or about August 26, 2021, the Management Committee of the Indian Energy Company, which included SAGAR R. ADANI and JAAIN, passed a resolution authorizing the Indian Energy Company to issue securities in the amount of $750 million.

(b)    In or about August 2021, SAGAR R. ADANI participated in a recorded roadshow presentation marketing the 2021 144A Bond, which recording was replayed for investors, including United States-based investors.

(c)    In or about November 2021, GAUTAM S. ADANI, SAGAR R. ADANI and JAAIN each approved a formal "Note for Approval" authorizing the Indian Energy Company to make use of the 2021 144A Bond proceeds and pass any necessary Board of Directors resolutions.

(d)    On or about December 27, 2022, JAAIN executed a Compliance Certificate on behalf of the Indian Energy Company in connection with the 2021 144A Bond.

(Title 18, United States Code, Sections 371, 3238 and 3551 <u>et</u> <u>seq.</u>)

<u>COUNT THREE</u>
(Wire Fraud Conspiracy)

130.    The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

131.    In or about and between 2021 through the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud current and prospective lenders and investors in

49

financial transactions, including the 2021 Syndicate Loan, 2021 144A Bond, 2023 Syndicate Loan and 2024 144A Bond, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349, 3238 and 3551 et seq.)

## COUNT FOUR
(Securities Fraud – the 2021 144A Bond)

132. The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

133. In or about and between 2021 through the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants GAUTAM S. ADANI, SAGAR R. ADANI and VNEET S. JAAIN, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in the 2021 144A Bond, in connection with

the purchase and sale of investments in the 2021 144A Bond, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2, 3238 and 3551 et seq.)

## COUNT FIVE
### (Conspiracy to Obstruct Justice)

134.    The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

135.    In or about and between 2022 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere and out of the jurisdiction of any particular State or district, the defendants CYRIL CABANES, SAURABH AGARWAL, DEEPAK MALHOTRA and RUPESH AGARWAL, together with others, did knowingly and intentionally conspire to corruptly alter, destroy, mutilate, and conceal a record, document, and other object with intent to impair the object's integrity and availability for use in an official proceeding and obstruct, influence and impede official proceedings, to wit: the Grand Jury Investigation, the FBI Investigation and the SEC Investigation, contrary to Title 18, United States Code, Sections 1512(c)(1) and (2).

(Title 18, United States Code, Sections 1512(k), 3238 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE, TWO, FOUR, AND FIVE

136.    The United States hereby gives notice to the defendants charged in Counts One, Two, Four and Five that, upon their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

137.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p), Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT THREE

138.    The United States hereby gives notice to the defendants charged in Count Three that, upon their conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(2)(A), which requires any person convicted of such offense, to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

139.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

> (a)    cannot be located upon the exercise of due diligence;
>
> (b)    has been transferred or sold to, or deposited with, a third party;
>
> (c)    has been placed beyond the jurisdiction of the court;
>
> (d)    has been substantially diminished in value; or
>
> (e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(2)(A) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

s/
FOREPERSON

*Breon Peace*
BREON PEACE
United States Attorney
Eastern District of New York

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice

54